**FILED**
CLERK, U.S. DISTRICT COURT

## DEC 11 2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____rsm_____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2024 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>ELI GRIJALVA,<br> aka "Skinny,"<br>ORLANDO OLIVAR,<br> aka "Tacuba,"<br>CARLOS TORRES-MIRANDA,<br> aka "Estricto,"<br> aka "Malaspecto,"<br>CHRISTOPHER MARTIR,<br> aka "Insolente,"<br>AMILCAR GONZALEZ,<br> aka "Lunatico,"<br>AGUSTIN AQUINO-MARTINEZ,<br> aka "Chino,"<br>JOSE ARREDONDO,<br> aka "Misterio,"<br>DOUGLAS TORRES,<br> aka "Midnight,"<br>MARIA CHAVEZ,<br> aka "Moana,"<br>MARCO HERNANDEZ,<br> aka "Clandestino,"<br>RIQUELMY ABARCA,<br> aka "Bago,"<br>BYRON CHINCHILLA<br> aka "Psycho,"<br>CRISTIAN MORENO-NAVARRO,<br> aka "Baby Gangster,"<br>MIGUEL RODRIGUEZ,<br> aka "Mikey," | CR No. 23-00545(A)-AB<br><br>F I R S T<br>S U P E R S E D I N G<br>I N D I C T M E N T<br><br>[18 U.S.C. § 1962(d): Racketeer Influenced and Corrupt Organizations Conspiracy; 18 U.S.C. § 1959(a)(5): Violent Crime in Aid of Racketeering; 18 U.S.C. §§ 924(c)(1)(A)(i), (iii): Using, Carrying, Possessing, and Discharging a Firearm in Furtherance of, and During and in Relation to, a Crime of Violence; 21 U.S.C. § 846: Conspiracy to Possess with Intent to Distribute and to Distribute Methamphetamine; 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii): Distribution of Methamphetamine; 18 U.S.C. § 922(g)(1): Felon in Possession of Ammunition; 18 U.S.C. § 922(g)(5): Alien in Possession of Ammunition; 18 U.S.C. § 1963, 21 U.S.C. § 853, 18 U.S.C. § 924(d)(1), and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

CRISTIAN GOMEZ-BENITEZ,
 aka "Orphan,"
JOSE ALVARADO,
 aka "Big Boy,"
JOSE ORTIZ,
 aka "Toro,"
JONATHAN LIZAMA,
 aka "Sabueso," and
CRISTIAN GOMEZ-PINEDA,
 aka "Diamante,"

          Defendants.

The Grand Jury charges:

GENERAL ALLEGATIONS

At times relevant to this First Superseding Indictment:

A.   THE RACKETEERING ENTERPRISE

1.   At all times relevant to this First Superseding Indictment, defendants ELI GRIJALVA, also known as ("aka") "Skinny," ("GRIJALVA"); ORLANDO OLIVAR, aka "Tacuba," ("OLIVAR"); CARLOS TORRES-MIRANDA, aka "Estricto," aka "Malaspecto," ("TORRES-MIRANDA"); AMILCAR GONZALEZ, aka "Lunatico," ("GONZALEZ"); AGUSTIN AQUINO-MARTINEZ, aka "Chino," ("AQUINO-MARTINEZ"); JOSE ARREDONDO, aka "Misterio," ("ARREDONDO"); DOUGLAS TORRES, aka "Midnight" ("TORRES"); RIQUELMY ABARCA, aka "Bago," ("ABARCA"); BYRON CHINCHILLA, aka "Psycho," ("CHINCHILLA") and CRISTIAN MORENO-NAVARRO, aka "Baby Gangster," ("MORENO") (collectively, the "defendants") and Christopher Martir, aka "Insolente" ("Martir"); Maria Chavez, aka "Moana" ("Chavez"); Marco Hernandez, aka "Clandestino" ("Hernandez"); Miguel Rodriguez, aka "Mikey" ("Rodriguez"); Cristian Gomez-Benitez, aka "Orphan" ("Gomez-Benitez"); Jose Alvarado, aka "Big Boy" ("Alvarado"); Jose Ortiz, aka "Toro" ("Ortiz"); Jonathan Lizama, aka "Sabueso" ("Lizama"); and Cristian Gomez-Pineda, aka "Diamante" ("Gomez-Pineda"); and others known and unknown to the Grand Jury,

2

were members and associates of the Mara Salvatrucha street gang in Los Angeles, otherwise known as MS-13 (hereinafter referred to as "MS-13"), a criminal organization operating in and around Los Angeles, California, whose members and associates engaged in, among other things, numerous acts of violence and other crimes, including attempted murder, assault with deadly weapons, robbery, extortion, conspiracy to traffic in narcotics, narcotics trafficking, and possessing firearms while prohibited from so doing.  At all times relevant to this First Superseding Indictment, MS-13 operated within the Central District of California and elsewhere.  MS-13, including its leaders, members, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, although not a legal entity, which was engaged in, and the activities of which affected, interstate and foreign commerce.  The enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

B.    BACKGROUND OF THE RACKETEERING ENTERPRISE

2.    Mara Salvatrucha was formed in Los Angeles, California in the mid-1980s by immigrants fleeing the civil war in El Salvador. Once in Los Angeles, they organized themselves into a group called Mara Salvatrucha, which was initially largely composed of Salvadoran immigrants.  "Mara" is a Central American term for gang.  "Salva" refers to El Salvador.  In the 1990s in Los Angeles, Mara Salvatrucha distinguished itself by committing brutal acts of violence against rival gang members and non-gang members.  In the mid-1990s, Mara Salvatrucha became associated with the Mexican Mafia, commonly

3

referred to as "la Eme" (which translates in English to "the M"), and added the number "13" to its name.  The number "13" marks the 13th letter of the alphabet: "M."  Thus, Mara Salvatrucha became MS-13. While MS-13 originated in Los Angeles, over the years, MS-13 spread as its members were deported to El Salvador and because its members traveled to other locations in the United States and abroad.  As a result, in addition to operating in Los Angeles, MS-13 operated nationally and internationally, with more than ten thousand members regularly conducting gang activities in at least ten states and Washington, D.C., and with thousands more conducting gang activities in Central America and Mexico.

3.  MS-13 in Los Angeles, and MS-13 nationally and internationally, were largely comprised of persons from Central America, including El Salvador, Honduras, and Guatemala.  Although each MS-13 locale had a common origin, MS-13 in Los Angeles operated differently in El Salvador, Honduras, Guatemala, and the other states within the United States.  Notwithstanding, clique names in other parts of the United States were named for existing cliques in Los Angeles.  At times, MS-13 members from other geographic locations traveled to Los Angeles to participate in leadership meetings; however, MS-13 in Los Angeles was independent and self-governing, and made its own decisions.  Conversely, MS-13 members in Los Angeles were sometimes called upon to provide input in other parts of the country.  Additionally, MS-13 members in Los Angeles trafficked narcotics from Los Angeles to other parts of the country.

C.    THE ENTERPRISE IN LOS ANGELES, CALIFORNIA

4.  One distinguishing feature about MS-13 in Los Angeles is that it is beholden to the Mexican Mafia, which is a criminal

4

organization that united Hispanic gang members under a single alliance that operates within the California state prison system, the federal prison system, the streets and suburbs of large cities throughout Southern California, and elsewhere.  Members of the Mexican Mafia, commonly referred to as a "Carnal," "Brother," "Big Homie," "Tio" (Spanish for "uncle"), and/or "Padrino" (Spanish for "godfather"), typically come from the ranks of local Southern California Hispanic street gangs, including MS-13.  By controlling the criminal activities occurring within prison facilities, providing protection for imprisoned members and associates of Hispanic gangs, and imposing discipline, often in the form of acts of violence, against both individuals and street gangs who fail to adhere to its directives, the Mexican Mafia has risen to the position where it now exercises control over Hispanic street gangs operating throughout the State of California.  Specifically, its individual members control one or more Hispanic street gangs, which serve as the power base through which the Mexican Mafia members operate their individual criminal enterprises.  In return for its integration into the Mexican Mafia, MS-13 members receive the Mexican Mafia's protection in the neighborhoods and also in prison.

5.    Like all gangs associated with the Mexican Mafia in California, MS-13 is required to pay a specified sum, commonly known as "taxes" or "rent" on a regular basis to a member of the Mexican Mafia.  In Los Angeles, each MS-13 clique or sub-set contributes a portion of its profits, derived primarily from narcotics sales and extortion of street vendors, to the Mexican Mafia.  Each member of an MS-13 clique, whether incarcerated or not, is expected to contribute financially to their clique's rent payment.  In return for the tax

payments, the Mexican Mafia provides protection to all MS-13 members incarcerated in county, state and federal prisons and jails in California.  Additionally, and in exchange for the tax payments, the Mexican Mafia allows MS-13 to sell narcotics in its territories.  Finally, the Mexican Mafia ensures that no other gang operates in MS-13's territory or otherwise interferes with MS-13's criminal activities.  Failure of MS-13 to pay its tax to the Mexican Mafia will result in a "green light" on MS-13, that is, a general order from the Mexican Mafia to assault or kill any incarcerated MS-13 member in any facility controlled by the Mexican Mafia.  It is unlikely that MS-13 in Los Angeles could continue to exist if it chose not pay its taxes, tantamount to extortion payments, to the Mexican Mafia.

6.    The Mexican Mafia invites some incarcerated MS-13 members to join its leadership.  In this role, those MS-13 members who are chosen to participate in managerial roles for the Mexican Mafia complete various tasks, including, but not limited to, facilitating the smuggling of narcotics into the prison facilities, carrying out orders of discipline and/or determining who will carry out orders of discipline, representing the Mexican Mafia amongst other leaders of the prison/custodial facility, and ensuring that MS-13 members, and other Hispanic gang members under their control follow the Mexican Mafia's code of conduct.  Additionally, incarcerated MS-13 members may still actively participate in MS-13's activities on the outside, including contributing rent money to their respective cliques, hearing disputes between MS-13 members and cliques, determining and/or agreeing or disagreeing with punishment, and ordering discipline for violating the Mexican Mafia's and MS-13's codes of

conduct.  While incarcerated, MS-13 members follow the Mexican Mafia's code of conduct.  Failure to comply with this rule can also result in discipline.

7.  MS-13's regular tax payment to the Mexican Mafia comes from MS-13's cliques and is typically paid by the overall leader(s) of MS-13 or by an MS-13 member designated as the enterprise's "treasurer." MS-13 obtains its regular tax payment from each of MS-13's cliques on a monthly or yearly basis.  MS-13 cliques obtain their payments from their individual members.  MS-13's overall leader(s), its treasurer, and clique leaders are involved in the coordination of tax collection throughout the territory MS-13 controls in Los Angeles. Additionally, each clique leader is responsible for collecting extortion, in the form of gang "dues," from each clique member in order to pay each clique's allotted monthly or yearly extortion payment to the Mexican Mafia.  If a clique member does not pay his/her "dues" to the clique, the clique shot caller will "green light" the delinquent member and punishment will be meted out, usually by violence.

8.  In Los Angeles, MS-13 operates under the "Los Angeles Program," which is distinct from programs in El Salvador, Honduras, Guatemala, and other parts of the United States, whereby its leaders and members make all decisions concerning how and when a new person becomes a member of MS-13, how MS-13 operates, when discipline is meted out, when a clique is responsible for paying its extortionate rent payments, the geographical boundaries of each clique, and the identity of the shot callers and leaders.

9.  MS-13 operated through subsets known as "cliques," which were usually named for a street within a clique's territory, or for

the neighborhood in which the clique operated.  MS-13 had approximately 20 cliques operating in Los Angeles, including, but not limited to, "Adams," "Centrales," "Coronados," "Francis," "Fulton," "Harvard," "Hollywood," "Leeward," "King Boulevard," "Molinos," "Normandie," "Parkview," "Southside," "Tiny Winos," "Travieso," and "Vagos."  Each clique typically had one or more leaders at any given point, commonly referred to as "shot callers," who were responsible for, among other things, managing the narcotics trafficking operation in the clique's territory, collecting extortion payments, directing the day-to-day management of the clique, enforcing MS-13's and the Mexican Mafia's codes of conduct, resolving intra-clique disputes, and representing their respective cliques at the MS-13 general meetings.  At various times throughout this conspiracy, the following defendants were shot callers of MS-13's cliques: defendant GRIJALVA, who for a time was also MS-13's overall leader, and defendant GONZALES for the Centrales clique, defendant OLIVAR for the Coronados clique, defendant TORRES-MIRANDA for the Parkview clique, and Christopher Martir for the Molinos clique.  Shot callers are also responsible for meeting with other clique leaders in order to achieve their common criminal purposes and to resolve disputes between the cliques.

10.  A clique adds new members through an initiation ritual known as "jumping in," during which several existing MS-13 members beat up a prospective MS-13 member for 13 seconds.  Once jumped in, an MS-13 member is expected to participate fully in MS-13's criminal activities.

11.  MS-13 members sometimes signify their membership with tattoos reading "Mara Salvatrucha," "MS," "MS-13," or other

variations of the gang's name.  MS-13 members typically refer to other members by their monikers, or nicknames, and often do not know fellow gang members' legal names.

12.  MS-13 has a self-imposed code of conduct, which is imposed and enforced to maintain compliance among its members.  MS-13 also adopts and enforces the Mexican Mafia's rules.  MS-13 enforces its rules and promotes discipline among its members by imposing monetary fines and threatening and committing acts of violence against members who break the rules.  This is known as being "courted" or "regulated."  MS-13, through its leadership or individual cliques, can vote for MS-13 members to be disciplined for violating MS-13's or the Mexican Mafia's codes of conduct.  Depending on the severity of the violation, MS-13, through its leadership or individual cliques, will decide whether the violator will receive a beating for 13, 26, or 39 seconds, all factors of 13, and will select at least three to four MS-13 members to administer the beatings, with one member counting aloud the seconds.  Additionally, for even more serious violations of MS-13's or the Mexican Mafia's codes of conduct, MS-13, through its leadership or individual cliques, may vote to introduce weapons into the beatings, to include knives, bats and/or pipes. Once an MS-13 member has been disciplined, the individual cliques may also vote to eject the disciplined member from their cliques.  If a member is voted out of the clique, he/she must be "jumped out" of the clique, which means that member will receive another beating. However, that member may join a different MS-13 clique, if the new clique votes to accept that member.  To join a new clique, that member must be "jumped in," or beaten for a designated period of time, usually 13 seconds.

9

13.  MS-13 has zero tolerance for members and associates who cooperate with law enforcement.  Once MS-13 has evidence that someone has cooperated with law enforcement, by receiving and reviewing law enforcement reports or videos of interviews, MS-13 issues a "green light" as to that person, which is an order that if any MS-13 member sees the person who is allegedly or actually cooperating with law enforcement, that person is to be killed on sight.

14.  MS-13 members also engage in acts of violence against innocent citizens and rival gang members in its territory. Participation in violent acts increases the respect accorded to members who commit violent acts.  Additionally, commission of violent acts by MS-13 members enhances the gang's overall reputation for violence in the community, resulting in the intimidation of citizens in MS-13's territory.

15.  MS-13 claims territory throughout the City and County of Los Angeles, including areas in all of the Los Angeles Police Department's Bureaus.  Historically and currently, MS-13's territorial strongholds were/are the geographical areas encompassing Rampart, Koreatown, Hollywood, and parts of the San Fernando Valley, including North Hollywood and Van Nuys.  MS-13 members write or paint graffiti in the areas in which they control to identify the area as controlled by MS-13.

16.  MS-13 also controls Lafayette Park located at Wilshire Boulevard and North Hoover Street in Los Angeles, which is controlled by the Coronado clique.  MS-13 members often meet at Lafayette Park to discuss gang business and mete out punishment for violations of MS-13's code of conduct.  Additionally, MS-13 controls approximately one fourth of MacArthur Park, located between S. Park View Street and

S. Alvarado Street, and 6th and 7th Streets, bisected by Wilshire Boulevard.  In the late 1990s, the Mexican Mafia divided MacArthur Park into four sections, to be controlled by four separate gangs, including MS-13.

17.  Narcotics sales provide the bulk of MS-13's profits.  As long as MS-13 pays its tax to the Mexican Mafia, MS-13 members are authorized, exclusively, to sell narcotics in MS-13-controlled territories.  Individual MS-13 members who sell narcotics are often required to provide a portion of their narcotics proceeds to the shot caller of the clique.  This money is used by the shot caller for a variety of purposes, including paying the clique's rent to the overall MS-13 leader and thus the Mexican Mafia, paying legal fees for MS-13 members in need, helping MS-13 members in need in El Salvador and other points abroad, and purchasing weapons that are maintained by the clique in their territory for protection.  If a clique member earns money for the clique by selling drugs or other criminal ventures, and contributes a portion to the shot caller, this money is oftentimes considered their rent contribution to the clique.

18.  MS-13 also derives income from the extortion of street and food vendors who operate in MS-13 controlled territory.  On a clique level, the clique shot caller identifies targets for extortion and coordinates which clique member is authorized to collect extortion from each vendor.  MS-13 extorts both legitimate and illegitimate businesses alike, though MS-13 tends to focus on illegitimate or "grey-market" businesses.  These businesses are often owned or run by illegal immigrants, who rarely report this extortion to law enforcement, despite the threats of violence which accompany the extortion.

11

D.    PURPOSES OF THE ENTERPRISE IN LOS ANGELES

19.    The purposes of the MS-13 enterprise include, but are not limited to, the following:

a.    Enriching members and associates of the Mexican Mafia and MS-13 through criminal activities, including drug sales, gun sales, and extortion, as well as the remittance of proceeds generated as a result of MS-13's criminal activities (referred to as "taxes");

b.    Preserving, promoting, and protecting the power, territory, and profits of MS-13 and its members and associates, through threats of violence and actual acts of violence, including robbery, extortion, assault, attempted murder and murder;

c.    Exposing and punishing MS-13 members and associates who are perceived to have violated MS-13's and the Mexican Mafia's codes of conduct;

d.    Maintaining MS-13's control and authority over its territory, often through threats, intimidation and acts of violence committed against local residents and rival gangs; and

e.    Violently retaliating against rival gang members or perceived outsiders who challenge the authority of MS-13 or the Mexican Mafia or who fail to pay debts owed to MS-13 members and associates.

E.    THE MEANS AND METHODS OF THE ENTERPRISE IN LOS ANGELES

20.    The means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of MS-13 included the following:

a.    Members and associates of the enterprise conspired to commit, attempted, and committed, acts of violence to protect and expand the enterprise's criminal operation, including assault,

robbery, and attempted murder, directed against rival gang members, neighborhood residents and visitors, and to violently discipline insubordinate members of the enterprise;

b.    Members and associates of the enterprise acquired, possessed, carried, and used deadly weapons, including firearms, in the course of the criminal enterprise's criminal activities;

c.    Members and associates of the enterprise promoted a climate of fear in the community through threats of harm and violence;

d.    Members and associates of the enterprise participated in narcotics trafficking, including the purchase and sale of controlled substances, and the sale of firearms to generate income;

e.    Members and associates of the enterprise frequently engaged in the aforementioned criminal activity in the presence of other MS-13 gang members and/or associates in order to enhance the status within MS-13 of those affirmatively conducting criminal acts;

f.    Members and associates of the enterprise used various techniques to avoid law enforcement scrutiny of the enterprise's criminal activities and to evade and frustrate law enforcement, such as the use of coded language to discuss criminal activities and other counter-surveillance techniques; and

g.    Members and associates of the enterprise protected and strengthened MS-13's standing by following the direction of the Mexican Mafia leadership; by corresponding with members of MS-13 and the Mexican Mafia through telephone calls and written correspondence; by remitting portions ("taxes") of drug sales and other illegal activities to Mexican Mafia members and associates; and by carrying

out violent acts against targets designated by Mexican Mafia members and associates.

COUNT ONE

[18 U.S.C. § 1962(d)]

[DEFENDANTS GRIJALVA, OLIVAR, TORRES-MIRANDA, GONZALEZ, AQUINO-MARTINEZ, ARREDONDO, TORRES, ABARCA, CHINCHILLA, and MORENO]

Paragraphs 1 through 20 of the General Allegations of this First Superseding Indictment are re-alleged and incorporated here.

A.   THE RACKETEERING CONSPIRACY

Beginning on a date unknown to the Grand Jury, and continuing to on or about November 8, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendants GRIJALVA, OLIVAR, TORRES-MIRANDA, GONZALEZ, AQUINO-MARTINEZ, ARREDONDO, TORRES, ABARCA, CHINCHILLA, and MORENO, and others known and unknown to the Grand Jury, being persons employed by and associated with the MS-13 criminal enterprise, an enterprise which was engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of:

1.   Multiple acts involving:

a.   Murder, in violation of California Penal Code Sections 21a, 31, 182, 187, 188, 189, 190, and 664;

b.   Robbery, in violation of California Penal Code Sections 21a, 31, 182, 211, 212, 212.5, and 664; and

15

2. Multiple offenses involving trafficking in controlled substances, including methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; and

3. Multiple acts indictable under Title 18, United States Code, Section 1956 (relating to laundering of monetary instruments).

It was a further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

B.   MANNER AND MEANS BY WHICH THE OBJECT OF THE RACKETEERING CONSPIRACY WAS TO BE ACCOMPLISHED

Among the manner and means used by the defendants and their co-conspirators to achieve the object of the conspiracy were the following:

1. An incarcerated MS-13 member who was also a member of the Mexican Mafia (the "MS-13 Inmate") would exercise control of MS-13 Los Angeles by designating certain MS-13 members, like defendant GRIJALVA, to be the overall shot caller for MS-13 Los Angeles. As the overall shot caller, defendant GRIJALVA would oversee MS-13's drug trafficking activities, coordinated the collection and distribution of extortionate taxes, conducted and attended MS-13 meetings, during which defendant GRIJALVA disseminated the MS-13 Inmate's orders to MS-13's general leadership and membership, authorized the "jumping in" of new members and the assault of members who were in bad standing with MS-13, authorized the killing of rival gang members, and communicated with the MS-13 Inmate on behalf of MS-13.

2. Defendants GRIJALVA, OLIVAR, TORRES-MIRANDA, and GONZALEZ, and co-conspirator Martir and others known and unknown to the Grand

16

Jury, were shot callers of MS-13's cliques and had responsibility over their respective clique's day-to-day activities, including rent collection, narcotics trafficking, witness intimidation, maintaining the clique's firearms, directing violence against members of the community and/or rival gang members, ensuring their clique's rent was paid to the MS-13 Inmate, ordering discipline of clique members who violated MS-13's code of conduct, grooming and developing new MS-13 members, and maintaining and/or expanding his clique's territory.

3.    Additionally, each clique member, including defendants AQUINO-MARTINEZ, ARREDONDO, TORRES, ABARCA, CHINCHILLA, and MORENO, and co-conspirators Hernandez, Rodriguez, Gomez-Benitez, Alvarado, Ortiz, Lizama, and Gomez-Pineda, and others known and unknown to the Grand Jury, would answer to the clique's respective shot caller and would be responsible for, among other things, protecting clique territory, marking or denoting clique territory by affixing graffiti to structures and public property located within clique territory, monitoring street corners for non-MS-13 member narcotics distributors, looking for ways to expand clique territory, and obtaining and maintaining firearms to aid in the protection of clique territory.

4.    Defendants GRIJALVA, OLIVAR, TORRES-MIRANDA, Martir, GONZALEZ, ARREDONDO, TORRES, ABARCA, CHINCHILLA, and MORENO, and co-conspirators Chavez, Hernandez, Rodriguez, Gomez-Benitez, Alvarado, Ortiz, and Lizama, and others known and unknown to the Grand Jury, would possess with intent to distribute, distribute, and facilitate the distribution of narcotics in the territories controlled by MS-13 and elsewhere.

17

5.    Defendants GRIJALVA, ABARCA, MORENO, and GONZALEZ, and others known and unknown to the Grand Jury, would discuss, possess, use, and/or direct others to use firearms in furtherance of acts of violence, including acts involving murder, to enforce the authority of MS-13 and enhance the prestige of MS-13 with the Mexican Mafia.

6.    The MS-13 Inmate would designate certain MS-13 members like defendant AQUINO-MARTINEZ to act as the treasurer for MS-13 Los Angeles.  As treasurer, defendant AQUINO-MARTINEZ would coordinate the collection of the drug proceeds and "taxes" from each MS-13 Los Angeles clique, disguising the source of those funds by depositing them into his bank accounts and forwarding them to the MS-13 Inmate through non-incarcerated proxies in the Central District of California and elsewhere.

C.    OVERT ACTS

On or about the following dates, in furtherance of the conspiracy, and to accomplish the object of the conspiracy, defendants, their co-conspirators, and others known and unknown to the Grand Jury, committed and caused to be committed various overt acts, within the Central District of California, and elsewhere, including, but not limited to, the following:

Overt Act No. 1:    On September 27, 2020, defendant TORRES robbed J.L., and during the robbery defendant TORRES told J.L. that defendant TORRES belonged to MS-13.

Overt Act No. 2:    On July 5, 2021, by telephone and text message using coded language, the MS-13 Inmate agreed to sell a confidential informant working at the direction of law enforcement ("CI-1") two pounds of methamphetamine for $3,000 and told CI-1 to

18

obtain the methamphetamine from a co-conspirator and to deliver payment for the methamphetamine to defendant CHINCHILLA.

Overt Act No. 3:   On July 6, 2021, by telephone using coded language, the MS-13 Inmate told CI-1 that defendant CHINCHILLA was prepared to accept money on behalf of the MS-13 Inmate for the sale of methamphetamine.

Overt Act No. 4:   On July 7, 2021, defendant CHINCHILLA accepted $3,000 from CI-1 as payment for CI-1's purchase of approximately 786 grams of methamphetamine in a deal arranged by the MS-13 Inmate.

Overt Act No. 5:   On July 28, 2021, by telephone and text message using coded language, defendant CHINCHILLA agreed to accept payment on behalf of the MS-13 Inmate for the sale of methamphetamine.

Overt Act No. 6:   On July 28, 2021, defendant CHINCHILLA accepted $3,000 from CI-1 as payment for CI-1's purchase of approximately 863 grams of methamphetamine from a co-conspirator in a deal arranged by the MS-13 Inmate.

Overt Act No. 7:   On October 25, 2021, defendant TORRES sold CI-1 a 9mm handgun of unknown manufacture, bearing no make, model, or serial number (also known as a "ghost gun") loaded with ten rounds of ammunition.

Overt Act No. 8:   On June 8, 2022, by text message using coded language, defendant GRIJALVA sent CI-1 two addresses where defendant GRIJALVA said he could meet CI-1 to sell the methamphetamine that a co-conspirator promised to CI-1.

Overt Act No. 9:   On June 9, 2022, defendant GRIJALVA sold approximately 109.4 grams of methamphetamine to CI-1 for $500.

Overt Act No. 10:    On June 15, 2022, defendant TORRES-MIRANDA sold approximately 69.5 grams of methamphetamine and a shotgun to a different confidential informant working at the direction of law enforcement ("CI-2") for $1,100.

Overt Act No. 11:    On June 22, 2022, defendant TORRES-MIRANDA sold approximately 53.7 grams of methamphetamine to CI-2 for $400.

Overt Act No. 12:    On June 29, 2022, defendant GONZALEZ sold approximately 81.9 grams of methamphetamine to CI-1 for $300.

Overt Act No. 13:    On July 13, 2022, by telephone and text message using coded language, defendant GRIJALVA agreed to sell three ounces of methamphetamine to CI-1 for $300.

Overt Act No. 14:    On July 20, 2022, defendant ARREDONDO and a co-conspirator sold approximately 53.9 grams of methamphetamine to CI-1 for $300.

Overt Act No. 15:    On July 20, 2022, defendant GRIJALVA sold approximately 81.8 grams of methamphetamine to CI-1 for $300.

Overt Act No. 16:    On August 15, 2022, by telephone and text message using coded language, a co-conspirator agreed to sell three ounces of methamphetamine to CI-1 for $300 in a deal that would be completed with defendant GRIJALVA.

Overt Act No. 17:    On August 17, 2022, defendants GRIJALVA and TORRES sold approximately 81 grams of methamphetamine to CI-1 for $300.

Overt Act No. 18:    On August 24, 2022, by telephone using coded language, defendant OLIVAR agreed to sell four ounces of methamphetamine to CI-2 for $800.

Overt Act No. 19:    On August 24, 2022, defendant OLIVAR sold approximately 99.6 grams of methamphetamine to CI-2 for $800.

20

Overt Act No. 20:   On August 29, 2022, by text message using coded language, defendant AQUINO-MARTINEZ requested that a co-conspirator pay defendant AQUINO-MARTINEZ the drug proceed taxes owed by the co-conspirator's clique for the previous month.

Overt Act No. 21:   On September 7, 2022, by telephone using coded language, defendant OLIVAR agreed to sell four ounces of methamphetamine to CI-2 for $800.

Overt Act No. 22:   On September 8, 2022, defendant OLIVAR sold approximately 99.7 grams of methamphetamine to CI-2 for $800.

Overt Act No. 23:   On October 29, 2022, by text message using coded language, defendant AQUINO-MARTINEZ requested that a co-conspirator pay defendant AQUINO-MARTINEZ the drug proceed taxes owed by the co-conspirator's clique for the previous month.

Overt Act No. 24:   On November 5, 2022, at the direction of the MS-13 Inmate, defendant GRIJALVA contacted defendants ABARCA, MORENO, and GONZALEZ and ordered them to murder A.A.

Overt Act No. 25:   On November 6, 2022, defendants ABARCA and MORENO attempted to murder A.A. by shooting him in front of his home in La Puente, California.

Overt Act No. 26:   On November 6, 2022, defendants ABARCA, MORENO, GONZALEZ, and GRIJALVA met at defendant GRIJALVA's home in Los Angeles where defendant GRIJALVA took the guns used by defendants ABARCA and MORENO in the attempted murder of A.A. and sawed them into pieces.

Overt Act No. 27:   On November 7, 2022, at the direction of the MS-13 Inmate, a co-conspirator paid cash to defendants ABARCA, MORENO, and GONZALEZ as a reward for their participation in the attempted murder of A.A. on November 6, 2022.

Overt Act No. 28:   On November 7, 2022, at the direction of the MS-13 Inmate, a co-conspirator gave approximately an ounce of drugs to defendant GRIJALVA as a reward for his participation in the attempted murder of A.A. on November 6, 2022.

Overt Act No. 29:   On November 28, 2022, by text message using coded language, defendant AQUINO-MARTINEZ requested that a co-conspirator pay defendant AQUINO-MARTINEZ the drug proceed taxes owed by the co-conspirator's clique for the previous month.

Overt Act No. 30:   On December 5, 2022, by text message using coded language, defendant ARREDONDO agreed to sell three ounces of methamphetamine to CI-1.

Overt Act No. 31:   On December 7, 2022, defendant ARREDONDO sold approximately 82.2 grams of methamphetamine to CI-1 for $420.

Overt Act No. 32:   On December 30, 2022, by text message using coded language, defendant AQUINO-MARTINEZ requested that a co-conspirator pay defendant AQUINO-MARTINEZ the drug proceed taxes owed by the co-conspirator's clique for the previous month.

Overt Act No. 33:   On January 20, 2023, by text message using coded language, defendant AQUINO-MARTINEZ requested that a co-conspirator pay defendant AQUINO-MARTINEZ the drug proceed taxes owed by the co-conspirator's clique for the previous month.

Overt Act No. 34:   On February 9, 2023, by telephone using coded language, defendant ABARCA told CI-1 that he contacted defendant GRIJALVA on CI-1's behalf and told defendant GRIJALVA that CI-1 wanted to buy three ounces of methamphetamine.

Overt Act No. 35:   On February 12, 2023, by telephone using coded language, defendant GRIJALVA agreed to sell three ounces of methamphetamine to CI-1 for $330.

22

Overt Act No. 36:   On February 13, 2023, in a telephone call using coded language, defendant ABARCA agreed to accept $30 from CI-1 as payment for coordinating defendant GRIJALVA's sale of methamphetamine to CI-1.

Overt Act No. 37:   On February 13, 2023, defendant GRIJALVA sold approximately 82.6 grams of methamphetamine to CI-1 for $330.

Overt Act No. 38:   On March 21, 2023, Chavez sold approximately 108.8 grams of methamphetamine to CI-1 for $460.

Overt Act No. 39:   On March 27 and March 28, 2023, by text message using coded language, a co-conspirator instructed CI-1 to send the remainder of the money for the sale of 882.2 grams of methamphetamine that took place on March 21, 2023, to defendant AQUINO-MARTINEZ.

Overt Act No. 40:   On March 28, 2023, by telephone using code language, defendant AQUINO-MARTINEZ told CI-1 that a co-conspirator designated defendant AQUINO-MARTINEZ as the recipient of the outstanding amount of money owed by CI-1 to the co-conspirator for the March 21, 2023, methamphetamine deal.

Overt Act No. 41:   On March 28, 2023, by text message using coded language, defendant AQUINO-MARTINEZ provided CI-1 with a telephone number that CI-1 could use to provide defendant AQUINO-MARTINEZ money via Internet cash transfer application.

Overt Act No. 42:   On May 1, 2023, Martir agreed to sell three ounces of methamphetamine to CI-1 for $375.

Overt Act No. 43:   On May 2, 2023, Martir and a co-conspirator sold approximately 145.4 grams of methamphetamine to CI-1.

Overt Act No. 44:   On July 12, 2023, Gomez-Pineda sold CI-1 a 9mm handgun of unknown manufacture, bearing no make, model, or serial

number (also known as a "ghost gun") loaded with three rounds of ammunition.

Overt Act No. 45:   On July 31, 2023, by telephone using coded language, Hernandez agreed to sell two ounces of methamphetamine to CI-1 for $260.

Overt Act No. 46:   On August 1, 2023, Hernandez sold approximately 55.53 grams of methamphetamine to CI-1 for $260.

Overt Act No. 47:   On October 2, 2023, by telephone using coded language, defendant MORENO agreed to sell four ounces of methamphetamine to CI-1 for $520.

Overt Act No. 48:   On October 2, 2023, by telephone using coded language, Rodriguez agreed to sell three ounces of methamphetamine to CI-1 for $600.

Overt Act No. 49:   On October 5, 2023, defendant MORENO sold approximately 107 grams of methamphetamine to CI-1 for $520.

Overt Act No. 50:   On October 5, 2023, Rodriguez sold approximately 81.5 grams of methamphetamine to CI-1 for $600.

Overt Act No. 51:   On October 9, 2023, by telephone using coded language, defendant OLIVAR agreed to sell four ounces of methamphetamine to CI-1 for $480.

Overt Act No. 52:   On October 11, 2023, by telephone using coded language, Gomez-Benitez agreed to sell four ounces of methamphetamine to CI-1 for $600.

Overt Act No. 53:   On October 12, 2023, defendant OLIVAR and Ortiz sold approximately 111 grams of methamphetamine to CI-1 for $480.

24

Overt Act No. 54:   On October 12, 2023, Gomez-Benitez and Alvarado sold approximately 81 grams of methamphetamine to CI-1 for $450.

Overt Act No. 55:   On October 15, 2023, by text message using coded language, Lizama agreed to sell four ounces of methamphetamine to CI-1 for $560.

Overt Act No. 56:   On October 19, 2023, Lizama sold approximately 109.3 grams of methamphetamine to CI-1 for $560.

D.    NOTICE OF SPECIAL ALLEGATIONS

The Grand Jury further alleges that:

7.    Beginning on a date unknown and continuing to on or about November 8, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendants GRIJALVA, OLIVAR, TORRES-MIRANDA, GONZALEZ, AQUINO-MARTINEZ, ARREDONDO, TORRES, ABARCA, CHINCHILLA, and MORENO, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally possess with intent to distribute, and distribute, at least 50 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A).

8.    On or about November 5, 2022, in Los Angeles County, within the Central District of California, defendants GRIJALVA, GONZALEZ, ABARCA, and MORENO, and others known and unknown to the Grand Jury, conspired to willfully, deliberately, and with premeditation and malice aforethought, murder A.A., in violation of California Penal Code Sections 182, 187, 188, and 189.

9.    On or about November 6, 2022, in Los Angeles County, within the Central District of California, defendants ABARCA and MORENO, and

others known and unknown to the Grand Jury, willfully, deliberately, and with premeditation and malice aforethought, unlawfully attempted to murder A.A., in violation of California Penal Code Sections 21a, 31, 187, 188, 189, and 664.

COUNT TWO

[18 U.S.C. § 1959(a)(5)]

[DEFENDANTS GRIJALVA, GONZALEZ, ABARCA, and MORENO]

1. At all times relevant to this First Superseding Indictment, MS-13, as described more particularly in Paragraphs 1 through 20 of the General Allegations, which paragraphs are re-alleged and incorporated here, including its leaders, members, and associates, constituted an enterprise, as that term is defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

2. At all times relevant to this First Superseding Indictment, MS-13, through its members and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is:

    a. Multiple acts involving:

        i. Murder, in violation of California Penal Code Sections 21a, 31, 182, 187, 188, 189, 190, and 664; and

        ii. Robbery, in violation of California Penal Code Sections 21a, 31, 182, 211, 212, 212.5, and 664; and

    b. Multiple offenses involving trafficking in controlled substances, including methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; and

c.    Multiple acts indictable under Title 18, United States Code, Section 1956(relating to money laundering of monetary instruments).

3.    Beginning on a date unknown and continuing to on or about November 6, 2022, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, defendants ELI GRIJALVA, also known as ("aka") "Skinny," AMILCAR GONZALEZ, aka "Lunatico," RIQUELMY ABARCA, aka "Bago," CRISTIAN MORENO-NAVARRO, aka "Baby Gangster," and others known and unknown to the Grand Jury, knowingly and willfully conspired to murder A.A., in violation of California Penal Code Sections 182, 187, 188, and 189.

COUNT THREE

[18 U.S.C. §§ 1959(a)(5), 2(a)]

[DEFENDANTS ABARCA AND MORENO]

1.   Paragraphs 1 through 20 of the General Allegations and paragraphs 1 and 2 of Count Two of this First Superseding Indictment are hereby re-alleged and incorporated by reference here.

2.   On or about November 6, 2022, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, defendants RIQUELMY ABARCA, also known as ("aka") "Bago," and CRISTIAN MORENO-NAVARRO, aka "Baby Gangster," each aiding and abetting the other, willfully, deliberately, and with premeditation and malice aforethought, attempted to murder A.A., in violation of California Penal Code Sections 31, 187(a), 188(a)(1), 189(a), and 664(a).

29

COUNT FOUR

[18 U.S.C. §§ 924(c)(1)(A)(i), (iii), 2(a)]

[DEFENDANTS ABARCA AND MORENO]

On or about November 6, 2022, in Los Angeles County, within the Central District of California, defendants RIQUELMY ABARCA, also known as ("aka") "Bago," and CRISTIAN MORENO-NAVARRO, aka "Baby Gangster," each aiding and abetting the other, knowingly used and carried a firearm during and in relation to, and possessed the firearm in furtherance of, a crime of violence, namely, Attempted Murder in in Aid of Racketeering, in violation of Title 18, United States Code, Section 1959(a)(5), as charged in Count Three of this First Superseding Indictment, and, in so doing, discharged the firearm.

COUNT FIVE

[21 U.S.C. § 846]

[GRIJALVA, OLIVAR, TORRES-MIRANDA, MARTIR, GONZALEZ, AQUINO-MARTINEZ, ARREDONDO, TORRES, CHAVEZ, HERNANDEZ, ABARCA, CHINCHILLA, MORENO, RODRIGUEZ, GOMEZ-BENITEZ, ALVARADO, ORTIZ, and LIZAMA]

Paragraphs 1 through 20 of the General Allegations of this First Superseding Indictment are re-alleged and incorporated here.

A.    OBJECTS OF THE CONSPIRACY

Beginning on a date unknown to the Grand Jury, and continuing to on or about November 8, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendants GRIJALVA, OLIVAR, TORRES-MIRANDA, MARTIR, GONZALEZ, AQUINO-MARTINEZ, ARREDONDO, TORRES, CHAVEZ, HERNANDEZ, ABARCA, CHINCHILLA, MORENO, RODRIGUEZ, GOMEZ-BENITEZ, ALVARADO, ORTIZ, and LIZAMA, and others known and unknown to the Grand Jury, conspired with each other to knowingly and intentionally possess with intent to distribute, and distribute, at least 50 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii).

B.    MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

The objects of the conspiracy were to be accomplished, in substance, as follows:

1.    The MS-13 Inmate would impose a rule on all MS-13 Los Angeles cliques that required them to buy methamphetamine for re-distribution from a co-conspirator, and others known and unknown to the Grand Jury, with some profits from that distribution flowing to the MS-13 Inmate.

31

2.    The MS-13 Inmate would designate certain MS-13 members, like defendant GRIJALVA, to be the overall shot caller for MS-13 Los Angeles.  As the overall shot caller, defendant GRIJALVA would oversee MS-13's drug trafficking activities and communicate with the MS-13 Inmate to coordinate drug trafficking activities for MS-13.

3.    MS-13 members would use violence and intimidation to control narcotics trafficking in territories controlled by MS-13. Narcotics sales would comprise the majority of revenue generated by MS-13.  In order to sell narcotics within MS-13's territory, one must either be an MS-13 member, an associate, or otherwise have permission from, and pay extortionate rent payments to, MS-13.

4.    MS-13 shot callers, including defendants OLIVAR, TORRES-MIRANDA, MARTIR, and GONZALEZ, and others known and unknown to the Grand Jury, would be responsible for the geographic territory under their cliques' respective control.  Within a clique's geographic boundaries, that clique, as controlled by the shot caller, would have exclusive rights to distribute narcotics.  Additionally, shot callers would be responsible for collecting, from MS-13's general members, their clique's extortionate rent payments, the bulk of which would likely be comprised of narcotics profits and proceeds.

5.    Additionally, each clique member, including defendants ARREDONDO, TORRES, HERNANDEZ, ABARCA, CHINCHILLA, MORENO, RODRIGUEZ, GOMEZ-BENITEZ, ALVARADO, ORTIZ, and LIZAMA and others known and unknown to the Grand Jury, would answer to the clique's respective shot caller and would be responsible for, among other things, protecting clique territory, marking or denoting clique territory by affixing graffiti to structures and public property located within clique territory, monitoring street corners for non-MS-13 member

32

narcotics distributors, looking for ways to expand clique territory, and obtaining and maintaining firearms to aid in the protection of clique territory, all to ensure that his or her clique could exclusively distribute narcotics within clique territory.

6. Each MS-13 member and associate, along with wholesale narcotics suppliers and street narcotics dealers, would receive authorization from the shot callers to traffic in controlled substances within individual clique territories, and in return, would be required to pay a portion of the drug proceeds, known as a "tax," to his or her respective MS-13 shot caller for the areas in which narcotics were trafficked.

7. Defendants GRIJALVA, OLIVAR, TORRES-MIRANDA, MARTIR, GONZALEZ, ARREDONDO, TORRES, CHAVEZ, HERNANDEZ, ABARCA, CHINCHILLA, MORENO, RODRIGUEZ, GOMEZ-BENITEZ, ALVARADO, ORTIZ, and LIZAMA, and others known and unknown to the Grand Jury, would possess with intent to distribute, distribute, and facilitate the distribution of narcotics in the territories controlled by MS-13.

8. The MS-13 Inmate would designate certain MS-13 members like defendant AQUINO-MARTINEZ to act as the treasurer for MS-13 Los Angeles. As treasurer, defendant AQUINO-MARTINEZ would coordinate the collection of the drug proceeds and "taxes" from each MS-13 Los Angeles clique and was responsible for forwarding those profits and taxes to the MS-13 Inmate.

C. OVERT ACTS

On or about various dates, in furtherance of the conspiracy, and to accomplish the objects of the conspiracy, defendants, and others known and unknown to the Grand Jury, within the Central District of California, committed various overt acts, including the overt acts

33

numbered 1 through 56 as set forth in Count One and incorporated by reference here, on or about the dates specified therein.

COUNT SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANT CHINCHILLA]

On or about July 7, 2021, in Los Angeles County, within the Central District of California, defendant BYRON CHINCHILLA, also known as "Psycho," and a co-conspirator, each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 786 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANT CHINCHILLA]

On or about July 28, 2021, in Los Angeles County, within the Central District of California, defendant BYRON CHINCHILLA, also known as "Psycho," and a co-conspirator, each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 863 grams, of methamphetamine, a Schedule II controlled substance.

COUNT EIGHT

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANT GRIJALVA]

On or about June 9, 2022, in Los Angeles County, within the Central District of California, defendant ELI GRIJALVA, also known as "Skinny," and a co-conspirator, each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 109.4 grams, of methamphetamine, a Schedule II controlled substance.

COUNT NINE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT TORRES-MIRANDA]

On or about June 15, 2022, in Los Angeles County, within the Central District of California, defendant CARLOS TORRES-MIRANDA, also known as "Estricto," aka "Malaspecto," knowingly and intentionally distributed at least 50 grams, that is, approximately 69.5 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT TORRES-MIRANDA]

On or about June 22, 2022, in Los Angeles County, within the Central District of California, defendant CARLOS TORRES-MIRANDA, also known as "Estricto," aka "Malaspecto," knowingly and intentionally distributed at least 50 grams, that is, approximately 53.7 grams, of methamphetamine, a Schedule II controlled substance.

COUNT ELEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS GRIJALVA and GONZALEZ]

On or about June 29, 2022, in Los Angeles County, within the Central District of California, defendants ELI GRIJALVA, also known as ("aka") "Skinny," AMILCAR GONZALEZ, aka "Lunatico," and a co-conspirator, each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 81.9 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWELVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANT ARREDONDO]

On or about July 20, 2022, in Los Angeles County, within the Central District of California, defendants JOSE ARREDONDO, also known as ("aka") "Misterio, and a co-conspirator, each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 53.9 grams, of methamphetamine, a Schedule II controlled substance.

41

COUNT THIRTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANT GRIJALVA]

On or about July 20, 2022, in Los Angeles County, within the Central District of California, defendant ELI GRIJALVA, also known as "Skinny," and a co-conspirator, each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 81.8 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FOURTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS GRIJALVA and TORRES]

On or about August 17, 2022, in Los Angeles County, within the Central District of California, defendants ELI GRIJALVA, also known as ("aka") "Skinny," and DOUGLAS TORRES, aka "Midnight," and a co-conspirator, each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 81 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FIFTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT OLIVAR]

On or about August 24, 2022, in Los Angeles County, within the Central District of California, defendant ORLANDO OLIVAR, also known as "Tacuba," knowingly and intentionally distributed at least 50 grams, that is, approximately 99.6 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SIXTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT OLIVAR]

On or about September 8, 2022, in Los Angeles County, within the Central District of California, defendant ORLANDO OLIVAR, also known as "Tacuba," knowingly and intentionally distributed at least 50 grams, that is, approximately 99.7 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SEVENTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT ARREDONDO]

On or about December 7, 2022, in Los Angeles County, within the Central District of California, defendant JOSE ARREDONDO, also known as "Misterio," knowingly and intentionally distributed at least 50 grams, that is, approximately 82.2 grams, of methamphetamine, a Schedule II controlled substance.

COUNT EIGHTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS ABARCA and GRIJALVA]

On or about February 13, 2023, in Los Angeles County, within the Central District of California, defendants RIQUELMY ABARCA, also known as ("aka") "Bago," and ELI GRIJALVA, aka "Skinny," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 82.6 grams, of methamphetamine, a Schedule II controlled substance.

COUNT NINETEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT CHAVEZ]

On or about March 21, 2023, in Los Angeles County, within the Central District of California, defendant MARIA CHAVEZ, aka "Moana," and a co-conspirator, each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 108.8 grams, of methamphetamine, a Schedule II controlled substance.

48

COUNT TWENTY

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANT MARTIR]

On or about May 2, 2023, in Los Angeles County, within the Central District of California, defendant CHRISTOPHER MARTIR, also known as "Insolente," and two co-conspirators, each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 145.4 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-ONE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT HERNANDEZ]

On or about August 1, 2023, in Los Angeles County, within the Central District of California, defendant MARCO HERNANDEZ, also known as ("aka") "Clandestino," knowingly and intentionally distributed at least 50 grams, that is, approximately 55.53 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT MORENO]

On or about October 5, 2023, in Los Angeles County, within the Central District of California, defendant CRISTIAN MORENO-NAVARRO, also known as "Baby Gangster," knowingly and intentionally distributed at least 50 grams, that is, approximately 107 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT RODRIGUEZ]

On or about October 5, 2023, in Los Angeles County, within the Central District of California, defendant MIGUEL RODRIGUEZ, also known as "Mikey," knowingly and intentionally distributed at least 50 grams, that is, approximately 81.5 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS OLIVAR and ORTIZ]

On or about October 12, 2023, in Los Angeles County, within the Central District of California, defendants ORLANDO OLIVAR, also known as ("aka") "Tacuba," and JOSE ORTIZ, aka "Toro," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 111 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS GOMEZ-BENITEZ and ALVARADO]

On or about October 12, 2023, in Los Angeles County, within the Central District of California, defendants CHRISTIAN GOMEZ-BENITEZ, also known as ("aka") "Orphan," and JOSE ALVARADO, aka "Big Boy," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 81 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT LIZAMA]

On or about October 19, 2023, in Los Angeles County, within the Central District of California, defendant JONATHAN LIZAMA, also known as "Sabueso," knowingly and intentionally distributed at least 50 grams, that is, approximately 109.3 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-SEVEN

[18 U.S.C. § 922(g)(1)]

[DEFENDANT TORRES]

On or about October 25, 2021, in Los Angeles County, within the Central District of California, defendant DOUGLAS TORRES, also known as "Midnight," knowingly possessed ammunition, namely, four rounds of Prvi Partizan 9mm ammunition, two rounds of Blazer 9mm ammunition, one round of Fiocchi 9mm ammunition, one round of Speer 9mm ammunition, one round of Remington 9mm ammunition, one round of Aguila 9mm ammunition, and one round of Federal Cartridge Company 9mm ammunition, loaded inside a 9mm handgun of unknown manufacture, bearing no make, model, or serial number (also known as a "ghost gun"), in and affecting interstate and foreign commerce.

Defendant TORRES possessed such ammunition knowing that he had been previously convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Theft and Unlawful Driving or Taking of a Vehicle, in violation of California Vehicle Code Section 10851(a), in the Superior Court of the State of California, County of Los Angeles, case number BA490536, on or about July 16, 2021.

COUNT TWENTY-EIGHT

[18 U.S.C. § 922(g)(5)]

[DEFENDANT GOMEZ-PINEDA]

On or about July 12, 2023, in Los Angeles County, within the Central District of California, defendant CRISTIAN GOMEZ-PINEDA, who was then an alien illegally and unlawfully in the United States, knowingly possessed ammunition, namely, three rounds of Winchester 9mm ammunition, loaded inside a 9mm handgun of unknown manufacture, bearing no make, model, or serial number (also known as a "ghost gun"), in and affecting interstate and foreign commerce.

Case 2:23-cr-00545-AB   Document 670   Filed 12/11/24   Page 58 of 63   Page ID #:2304

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 1963]

1.    Paragraphs 1 through 20 of the General Allegations of this First Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.    The allegations contained in Count One of this First Superseding Indictment are hereby repeated, re-alleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963.  Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence, in accordance with Title 18, United States Code, Section 1963, in the event of any defendant's conviction under Count One of this First Superseding Indictment.

3.    Any and each defendant convicted of Count One of this First Superseding Indictment shall forfeit to the United States:

a.    any interest said defendant has acquired or maintained in violation of Title 18, United States Code, Section 1962;

b.    any interest in, security of, claim against, or property or contractual right affording a source of influence over, any enterprise which said defendant has established, operated, controlled, conducted, or participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and

c.    any property constituting or derived from any proceeds obtained, directly or indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1962.

4.    Pursuant to Title 18, United States Code, Section 1963(m), each defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph, if, as the result of any act or omission of that defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

5.    Any defendant convicted of Count One of this First Superseding Indictment, and each such defendant, is jointly and severally liable for the forfeiture obligations as alleged above.

FORFEITURE ALLEGATION TWO

[21 U.S.C. § 853; 28 U.S.C. § 2461(c)]

1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 21, United States Code, Section 853 and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in Counts Five through Twenty-Six of this First Superseding Indictment.

2. Any defendant so convicted shall forfeit to the United States of America the following:

(a) All right, title and interest in any and all property, real or personal, constituting or derived from, any proceeds which the defendant obtained, directly or indirectly, from any such offense;

(b) All right, title and interest in any and all property, real or personal, used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of any such offense;

(c) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

3. Pursuant to Title 21, United States Code, Section 853(p), any defendant so convicted shall forfeit substitute property if, by any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in

60

value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c)]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offense set forth in any of Counts Twenty-Seven and Twenty-Eight of this First Superseding Indictment.

2.   Any defendant so convicted shall forfeit to the United States of America the following:

a.   all right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to any of the offenses; and

b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the convicted defendant shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

///

62

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/
Foreperson

E. MARTIN ESTRADA
United States Attorney

LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division

SHAWN T. ANDREWS
Assistant United States Attorney
Terrorism and Export Crimes
Section

63